NOT RECOMMENDED FOR PUBLICATION
File Name:  05a0067n.06
Filed:  January 31, 2005

No. 03-3010

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT


**GEZIM GJINAJ,**

                    **Petitioner,**

                                        **On Petition for Review of**

**v.**                                      **an Order of the**

                                        **Board of Immigration Appeals**

**JOHN ASHCROFT, Attorney General,**

                    **Respondent.**

_____/

**BEFORE: SUTTON and COOK, Circuit Judges; and ROSEN, District Judge.**[*]

    ROSEN, District Judge.

## I.  INTRODUCTION

Petitioner Gezim Gjinaj seeks review of the December 13, 2002 Order of the Board of Immigration Appeals ("BIA") which affirmed the Immigration Judge's denial of Petitioner's applications for asylum and withholding of removal pursuant to the Immigration and Nationality Act (the "INA") and the United Nations Convention Against Torture (the "Torture Convention").  For the reasons stated below, the BIA's

_____

[*] The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation.

1

decision is AFFIRMED.

## II. BACKGROUND

## A. PROCEDURAL HISTORY

Petitioner, Gezim Gjinaj, a native and citizen of Albania, entered the United States without inspection on or about September 15, 1997. The Immigration and Naturalization Service ("INS") commenced removal proceedings against Petitioner on March 4, 1998, charging him with removability under the Immigration and Nationality Act. At a hearing held before an Immigration Judge, Petitioner conceded removability as charged but submitted an application for asylum and withholding of removal under the INA and the Torture Convention.

A formal hearing was held on the merits of Petitioner's claims on July 12, 1999. Petitioner was the only witness to testify at the hearing. Documentary evidence was presented which included Petitioner's asylum applications and government documents relating to country conditions in Albania. Petitioner also proffered copies of certain other documents including Petitioner's Albanian passport; copies of what Petitioner alleged to be his official Albanian employment record and his birth certificate; and documents relating to his membership in the L'Egalite Party and in the Formerly Politically Persecuted Organization.

After the conclusion of the testimony, the Immigration Judge denied Petitioner's applications for asylum and withholding of removal and ordered him deported to

Albania.  The IJ found that Mr. Gjinaj lacked credibility and, accordingly, failed to carry his burden of establishing his eligibility for relief.  The IJ further found that even if Gjinaj were credible, the government had established that conditions in Albania had changed to such an extent that Petitioner no longer had a well-founded fear of being persecuted if he were to return to that country.

Petitioner filed a timely appeal of the IJ's decision with the BIA.  On December 13, 2002, the BIA summarily affirmed the decision of the Immigration Judge without opinion.  Petitioner filed the instant appeal on January 6, 2003.

## B.    PERTINENT FACTS

### 1.  PETITIONER'S ALLEGATIONS

Petitioner alleged in his testimony[1] that he was born on June 13, 1970, in Giumire[2], an internment camp in Shkodra, Albania.  He testified that he and his family escaped from internment camp in January 1990 during protest demonstrations.  According to his testimony, Petitioner was not arrested at this demonstration, but he said that a few months later, on July 2, 1990, he and his father were arrested during a demonstration in Shkodra calling for the overthrow of the Communist regime.  Petitioner testified that he and his father were detained for three days and beaten by men wearing

---

[1] References herein to "testimony" refer to Petitioner's testimony before the Immigration Judge.  This is distinct from references to statements made by Gjinaj in his asylum application.  As discussed below, the Immigration Judge found Petitioner to lack credibility, in part because of discrepancies between what he alleged in his in-court testimony and what he alleged in his asylum application.

[2] Petitioner refers to this location as "Gruemire" in his application; however, in Petitioner's testimony and in the government's brief it is referred to as "Giumire."

3

masks whom Petitioner believed were police officers.

According to Petitioner's testimony, he was arrested on April 2, 1991 at another demonstration, this time calling for the overthrow of the Socialist Party. In his asylum application, Petitioner stated that in this demonstration, he was cut with a bayonet, injured severely in the left leg, and shot in the right side of his chest when he moved while a pistol was pointed at him. Petitioner further alleged in his application that his captors thought that they had killed him and left him there to die, but others came from the demonstrations and took him to the hospital.

Petitioner testified that he was operated on at the hospital to remove the bullet from his chest, and that he stayed in the hospital until May 5, 1991. Although he did show the Immigration Judge scars which the IJ acknowledged could possibly be scars from surgery, Petitioner presented no independent corroborative evidence to substantiate his claim of hospitalization or surgery to remove any bullet. He claimed that after being released from the hospital, he was again taken to jail and questioned, and finally released on June 16, 1991, whereupon he claimed to have been immediately drafted into the army. Petitioner said that he stayed in the army until February 2, 1992. He further testified that while he was in the army, his father was beaten to death at the police station after a demonstration. However, he admitted that he had no independent knowledge of the circumstances of his father's death but merely came to this conclusion after talking to family friends after he got out of the army.

4

Petitioner testified that the Democratic Party won the next election, and he got a job as an Albanian government inspector of social and economic aid in July 1992. In this position, Petitioner was responsible for dispensing economic aid to Albanian citizens. During this time frame, Petitioner testified that he joined the L'Egalite movement (which is a political party that supported a return to the monarchy), the Formerly Politically Persecuted Organization, the Lawful Landowners Association, and the Democratic movement. He further testified that his job with the Albanian government ended in July 1997 when the Socialist Party came into power. He said he was fired because communist/socialist families complained that they were not receiving aid from Petitioner. Petitioner then claimed that he was arrested by the secret police, beaten, and held for three days. He said he was subsequently released on July 20, 1997, and dropped off in a field a few kilometers outside the city. According to his testimony, Petitioner left Albania that same night, July 20, 1997, with no documents and no clothing other than what he was wearing. He testified that he walked through the mountains to Montenegro and he stayed at a cousin's house there until September 12, 1997, when he went to Germany, from there to Mexico, and finally crossed the border into the United States, illegally, on September 15, 1997.

Petitioner testified that once he was in the United States, he obtained (by mail) some of his "documents." He said that before he arrived in the United States, he had told one of his uncles where he had hid his "documents" in his home in Albania in case

something happened to him. He testified that he received the documents in the United States on September 17, 1997 (i.e., just two days after he arrived). These documents were among those proffered to the Immigration Court in support of his request for asylum. The documents included: (1) an Employee Booklet indicating the place, date, type of employment and reason for terminating, given as "terminated from work for political reasons"[3]; (2) a membership card in Formerly Politically Persecuted Organization; (3) a membership card in the L'Egalite Party; and (4) his birth certificate. The legitimacy of these documents and the legitimacy of Petitioner's Albanian passport were questioned at Petitioner's immigration hearing.

With respect to his passport, Petitioner testified that he received the passport on November 25, 1997 after he was already in the United States. He said that his uncle had "bought it" for him from a person who worked for the government. Petitioner explained in his testimony that "people like us not very often get passports because of fear that we might leave." He testified that he had obtained the passport because he needed to identify himself. He testified that his uncle had used negatives from a picture that had been previously taken of him, had prints made, and had taken them to a person who prepares passports.

As indicated above, the legitimacy of Plaintiff's passport and other documents were closely questioned by the Immigration Judge. As the IJ observed, all of the

---

[3] Plaintiff explained that an Employee Booklet was kept by every Albanian, and employers were required to mark in the Employee Booklet dates of employment. The Booklet allegedly is to keep track of employment for purposes of social security benefits.

documents, although ostensibly bearing different dates, had the same picture. Further, the pictures all appeared to have a part of a seal on them which was not related to any seal on the documents.

## 2. THE IMMIGRATION JUDGE'S FINDINGS

The Immigration Judge found Petitioner not credible and noted several inconsistencies between Petitioner's asylum application and his in-court testimony. The IJ specifically noted that Petitioner had claimed in his application that the secret police showed him a file that they had on his family after he had been shot. However, he testified at the hearing that he was shot in 1991 and he was shown this file upon his arrest in 1990. The court also observed that Petitioner had stated in his asylum application that after losing his government job dispensing economic aid, he was detained for hours, but at the hearing, he testified that he was detained for three days. The court also noted that Petitioner made no mention in his asylum application of having participated in, or having suffered any reprisals as a result of, any demonstrations in July 1990, but this was the focal point of his hearing testimony.

With respect to the scars that Petitioner showed the Immigration Judge, although Petitioner testified that these were from wounds he suffered after being arrested for participating in a political protest, as the IJ observed, he did not go to any doctors in the United States to verify that his wounds were what he alleged them to be, and he did not have any documentation showing that he had been hospitalized. The Immigration Judge

7

found that Petitioner could easily have obtained corroborating evidence such as a statement or record from the hospital regarding his alleged gunshot wound, but chose not to do so, testifying that he did not think it was important. Further, as the IJ observed, both Petitioner's mother and sister were living in Macedonia at the time, and either one of them could have provided written statements to corroborate Petitioner's testimony. Although Petitioner testified that his mother was illiterate and, therefore, was unable to give an affidavit, he never gave an explanation as to why his sister could not provide an affidavit. Petitioner also stated that before he was shot, he was severely beaten on his left leg. He did not corroborate this and the IJ believed that this, too, could easily have been corroborated with medical evidence.

The Immigration Judge also found particularly incredible Petitioner's testimony concerning the various documents he proffered as evidence at the hearing. With respect to the documents, Petitioner testified that he had his uncle secure his alleged Albanian employment record from his previous employer just a few days prior to his testimony. The Immigration Judge noted, however, that if Petitioner was truly being sought by the Albanian government as he claimed, it would have been very difficult to obtain this document from his former employer. Petitioner also testified that he had gotten his Albanian passport from his uncle several months after leaving Albania, but the IJ found that it would have been particularly difficult, if not impossible, for him to have a passport delivered to him in the United States if Petitioner was truly wanted by the Albanian

8

government, as he claimed.

Further, as indicated above, there was a partial stamp on Petitioner's picture on several of his "documents" that appeared to have no relation to any stamp or seal on the respective documents. This led the Immigration Judge to conclude that the picture had been lifted from some other document since the entire seal was not there. Further, the same exact picture was on Petitioner's membership card in the Formerly Politically Persecuted Organization, the document noting his membership in the L'Egalite Party, his passport, his birth certificate, and his asylum application, although each of these documents bore markedly different dates.

The Immigration Judge also specifically found Petitioner's birth certificate to be fraudulent. With respect to his birth certificate, Petitioner testified that he called his uncle from Montenegro after he had fled Albania on July 20, 1997 and told his uncle to go to his apartment and get the negative for the picture and information necessary for his birth certificate. However, the certificate verifying his birth was dated July 14, 1997, which is *before* Petitioner even left the country and, in fact, before he was fired from his government job. The IJ found that the birth certificate issuance should have been dated a month after the date he was fired because it would take that long to gather the appropriate information, obtain a government record, and send Petitioner the birth certificate. Based on the foregoing inconsistencies and evidentiary deficiencies, the Immigration Judge found that Petitioner's testimony "was not only not truthful, but approaches being

9

fraudulent in nature." [7/12/99 Oral Decision and Order of the Immigration Judge, p. 23.] Accordingly, the IJ determined that Petitioner failed to satisfactorily establish that he was a victim of past political persecution or that he would face persecution if he were to be returned to Albania. Therefore, the IJ denied Petitioner's applications for asylum and withholding of removal.

The Board of Immigration Appeals affirmed the IJ, without opinion.

## III. DISCUSSION

### A. STANDARD OF REVIEW

Where, as here the Board of Immigration Appeals affirms the IJ's decision without opinion, we review the IJ's decision as the final agency decision. *Denko v. INS*, 351 F.3d 717, 726 (6th Cir. 2003).[4] We review that decision under the substantial evidence test. This Court can reverse only if "any reasonable adjudicator would be compelled to conclude the contrary." 8 U.S.C. § 1252(b)(4)(B); *see also Yu v. Ashcroft,* 364 F.3d 700, 703 n.2 (6th Cir. 2004).

Credibility determinations are considered findings of fact and, as such, are reviewed under the substantial evidence standard. *Yu*, 364 F.3d at 703; *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004). "This is a deferential standard: A reviewing court should not reverse simply because it is convinced that it would have decided the case differently." *Id.* at 925-926 (internal quotation marks and citation omitted). However, while an adverse

---

[4] Further, our review is restricted to the contents of the administrative record. 8 U.S.C. § 1252(b)(4)(A).

credibility finding is afforded substantial deference, the finding must be supported by specific reasons. *Id.* at 926; *see also Daneshvar v. Ashcroft*, 355 F.3d 615, 623, n.7 (6th Cir. 2004). Further, an adverse credibility finding must be based on issues that go to the heart of the applicant's claim; it cannot be based on an irrelevant inconsistency. *Id.* at 619-20 n.2.

**B.** **BECAUSE PETITIONER DID NOT PRESENT CREDIBLE EVIDENCE OF PAST PERSECUTION OR A WELL-FOUNDED FEAR OF FUTURE PERSECUTION, HE DOES NOT QUALIFY AS A "REFUGEE" UNDER THE INA**

Under the Immigration and Nationality Act, the Attorney General has discretion to grant asylum to a "refugee." 8 U.S.C. § 1158(b).[5] A refugee is defined in the INA as a "person who is unable or unwilling to return to his home country because of past persecution or a well-founded fear of persecution." 8 U.S.C. § 1101(a)(42)(A). This persecution must be on account of "race, religion, nationality, membership in a particular social group, or political opinion." *Id.* The petitioner bears the burden of either demonstrating that he suffered past persecution or that he has a well-founded fear of future persecution. *Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998); 8 C.F.R. § 208.13(b). An applicant who establishes past persecution is presumed to have a well-founded fear of future persecution. *Mikhailevitch,* 146 F.3d at 389; 8 C.F.R. § 208.13(b)(1). However, that presumption may be rebutted if the government establishes, by a preponderance of the evidence, that there has been a fundamental change in country

---

[5] The Attorney General has delegated his immigration authority to the Immigration Judges and the Board of Immigration Appeals.

conditions such that the applicant no longer has a well-founded fear of persecution.

*Mikhailevitch,* 146 F.3d at 389; 8 C.F.R. § 208.13(b)(1)(i).

## 1. PETITIONER FAILED TO PRESENT CREDIBLE EVIDENCE OF PAST PERSECUTION

Absent documentary evidence, an asylum applicant's testimony regarding a claim of past persecution must be credible and persuasive, referring to "specific facts that give rise to an inference that the applicant has been singled out for persecution." *Klawitter v. INS*, 970 F.2d 149, 154 (6th Cir. 1992) (internal quotation marks and citations omitted). A determination of the applicant's credibility must be made in order to determine whether he has established that he endured past persecution. *See Yu*, 364 F.3d at 703. As noted, the IJ's adverse credibility findings "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B).

In this case, the Immigration Judge found Petitioner not credible based upon various inconsistencies between Petitioner's testimony and his application for asylum that were central to Petitioner's claim. The findings were supported by a number of specific reasons which were set forth in the IJ's decision. Among the inconsistencies noted by the IJ were the following. First, the IJ noted that Petitioner had claimed in his asylum application that the Albanian secret police showed him a file that they had on his family after he had been shot. However, his testimony at the hearing was that he was shown this file in 1990 and he was shot in 1991. The IJ also noted that Petitioner had stated in his asylum application that after he was fired from his government job, he was detained by the

12

police for hours, but at the hearing, he testified that he was incarcerated for three days. The IJ further noted that Petitioner made no mention whatsoever in his asylum application of having suffered reprisals as a result of having participated in demonstrations in July 1990, but this was the focal point of his hearing testimony.

The IJ further found that a number of the documents which were presented by Petitioner in support of his asylum claim -- including Petitioner's birth certificate and passport -- were fraudulent. With respect to the documents, the IJ observed that several of the documents, although they had different dates, each bore the exact same picture of Petitioner. Furthermore, there was a partial stamp on Petitioner's picture on several of the documents that appeared to have no relation to any stamp or seal on the documents. This led the IJ to conclude that the picture had been lifted from some other document.

The IJ specifically found Petitioner's birth certificate to be fraudulent for the following reasons. Petitioner testified that he called his uncle from Montenegro after he had been fired and had fled Albania on July 20, 1997 and told his uncle to go to his apartment and get the picture and the information necessary to obtain his birth certificate. However, the document that Petitioner presented as verifying his birth was dated July 14, 1997, i.e., nearly a week *before* he left Albania and, in fact, before he was fired from his government job. The IJ found that, if it were a valid document, the birth certificate document would have been dated a month after the date Petitioner was fired because it would take that long to gather the appropriate information, obtain a government record,

13

and send the document to Petitioner outside of Albania.

The IJ also based his adverse credibility determination on Petitioner's failure to corroborate his testimony with medical evidence or statements from members of his family. An applicant's testimony, **if credible**, may be sufficient to sustain his or her burden of proof without corroboration. 8 C.F.R. §208.13(a); *see also, Pilica v.* INS, 388 F.3d 941, 954 (6th Cir. 2004) (quoting *Perkovic v. INS*, 33 F.3d 615, 621(6th Cir. 1994)) ("[T]he alien's own testimony can be sufficient to support an application for asylum, where the testimony is believable, consistent and sufficiently detailed to provide a plausible and coherent account of the basis for his fear." (Internal quotation marks and citation omitted.)) However, if the applicant's credibility is in question, the applicant must provide other evidence to corroborate his testimony. *Nsue-Bisa v. Ashcroft*, 98 Fed.Appx. 436, 439-440 (6th Cir. 2004). As indicated, the Immigration Judge found that the Petitioner's credibility was in question due to numerous inconsistencies in Petitioner's testimony and the seriously suspect nature of a number of documents proffered by him. Therefore, the IJ looked for corroborative evidence, but found it lacking.

Petitioner was specifically asked several times about corroboration for his claims of injury at the hands of political persecutors, but Petitioner admitted he never tried to obtain any corroborating evidence. As the Immigration Judge found, it would have been relatively easy to attempt to corroborate his claims with hospital records or testimony of members of his family, but Petitioner made no attempt to do so. Therefore, since the IJ

found Petitioner's testimony to be incredible and he did not make any effort to corroborate his claims, the IJ properly determined that Petitioner failed to prove past persecution to qualify for asylum as a refugee under the INA.

## 2. PETITIONER ALSO FAILED TO ESTABLISH A WELL-FOUNDED FEAR OF FUTURE PERSECUTION

When an applicant for asylum fails to prove past persecution, he is not entitled to the presumption of a well-founded fear of suffering future persecution. 8 C.F.R. § 208.13(b)(1). In order to establish entitlement to asylum without this presumption, the applicant can prove a well-founded fear of persecution by establishing that: (1) he has a fear of persecution based on political opinion; (2) there is a reasonable possibility of suffering such persecution; and (3) he is unable or unwilling to return to that country because of such fear. *Mikhailevitch*, 146 F.3d at 389. The applicant, however, is not required to show that there is more than a 50% chance of the persecution taking place. *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987).

To establish a well-founded fear of future persecution for purposes of an asylum claim, the applicant must establish that his fear of persecution is both subjectively genuine and objectively reasonable. *Ali v. Ashcroft*, 366 F.3d 407, 410 (6th Cir. 2004). In order to satisfy the subjective portion of this test, the alien must actually fear that he would be persecuted upon returning to his country. *Id.* However, for the objective portion of the test, an applicant's uncorroborated testimony is insufficient. *Id*. at 411.

Petitioner testified that he was persecuted for his Democratic Party affiliation and that

15

he was physically beaten on numerous occasions, but he did not corroborate his physical scars with hospital records or other credible evidence. Further, the Immigration Judge determined that Petitioner made many inconsistent statements and, as a result, found his testimony to be incredible. Thus, although Petitioner may have been able to show that he has a subjective fear of persecution based on political opinion, his lack of credibility and inability to provide the Immigration Judge with any corroborating evidence makes his fear objectively unreasonable. Therefore, Petitioner has not met his burden of establishing that he is qualified for refugee status based upon a well-founded fear of future persecution.[6]

### C. EVEN IF THE PRESUMPTION OF WELL-FOUNDED FEAR ARISES FROM PAST PERSECUTION, A CHANGE OF CIRCUMSTANCES IN PETITIONER'S HOME COUNTRY MAKES HIS FEAR OF FUTURE PERSECUTION UNREASONABLE.

In the absence of a showing of past persecution, courts need not examine existing country conditions. *See Kurshimi v. Ashcroft*, 102 Fed. Appx. 172, 176 (1st Cir. 2004); *Beganovic v. Ashcroft*, 116 Fed. Appx. 279, 281 (5th Cir. 2004). However, because the Immigration Judge specifically addressed the Government's "changed conditions" argument in ruling on Petitioner's application, and because the parties have addressed this

---

[6] The Court notes that an immigration judge may deny an alien's request for asylum simply based on the alien's submission of a counterfeit document. *See* 8 U.S.C.A. §1158; *Niang v. Ashcroft*, 96 Fed. Appx. 341, 342 (6th Cir. 2004). Here, as indicated, the Immigration Judge specifically found Petitioner's birth certificate to be fraudulent. Petitioner testified that his uncle went to Petitioner's apartment to gather the information needed for the birth certificate after Petitioner was fired, but the birth certificate is dated *before* Petitioner was fired. Therefore, the Immigration Judge was justified in denying Petitioner's claim for political asylum based solely on his determination of the falsity of his birth certificate.

16

issue in their appeal briefs, in the interest of completeness, we, too, will address the "changed conditions" argument.

The presumption of well-founded fear established by evidence of past persecution is a rebuttable one and can be rebutted if it is shown that conditions have changed to such an extent that the asylum applicant no longer can have a well-founded fear of being persecuted if he were to return to his home country.  8 C.F.R. § 208.13(b)(1)(i)(2003). However, to rebut the presumption, the government must do more than show that the circumstances in the country have drastically changed.  *Ouda v. INS*, 324 F.3d 445, 452 (6th Cir. 2003).  The government must also show that this change negates the particular applicant's well-founded fear of persecution.  *Id.*  The Immigration Judge determined that the government met this standard in this case.

The government presented evidence that a new Prime Minister, Pandeli Majko, was elected in Albania, and he has been described as generally more acceptable to the population, intent on bringing a new approach to the country's political life. Furthermore, according to the State Department's February 1998 *Albania Country Report on Human Rights Practices for 1998* ("*Country Report*"),[7] which was presented to the Immigration Judge as part of the Government's evidence in this case, there were no reports of killings based solely on persecution in 1998, i.e., the year after Petitioner left the country.  The *Country Report* also states that a parliamentary commission drafted a

---

[7] The 1998 *Country Report* and the 1998 report profiling Albanian asylum claims (discussed *infra*) were the most recent reports available at the time of Petitioner's hearing before the Immigration Judge.

17

new Constitution that was approved in a national referendum. Observers found that the referendum was conducted fairly. Further, the State Department's November 1998 *Albania - Profile of Asylum Claims & Country Conditions Addendum* ("*Profile*"), which was also presented to the Immigration Judge in this case, stated that, as of 1998, people are rarely targeted for mistreatment on political grounds in Albania, and that the government there lacked the resources or will to carry out such retribution. The 1998 *Profile* also reports that Albania is an ethnically homogenous and religiously tolerant society.

Relying on these State Department reports, the Immigration Judge found that "even if you could stretch credibility and believe [Petitioner], the record is quite clear that the government [of Albania] now in the hands of the socialists, is a kinder, gentler socialist government," and there is "no indication that this kinder, gentler socialist government would target Petitioner or attempt to persecute him or torture him." [7/12/99 Oral Decision and Order, p. 29.] Although Petitioner also presented some articles supporting a contrary view, all that is required for the government to rebut a Petitioner's well-founded fear is a preponderance of the evidence. A preponderance of the evidence requires only that the government's evidence "make the scales tip slightly" in its favor. *See J.C. Penney Ins. Co. v. Varney*, 853 F.2d 926, 1988 WL 82351 (6th Cir. 1988) at \*\*2 (unpublished table opinion); *see also Kendall v. City of Canfield*, 76 Fed.Appx. 617, 622 (6th Cir. 2003). The IJ was satisfied that the government met this standard. Therefore, the IJ properly

determined that even if Petitioner had been found to be credible and to have a well-founded fear of persecution, there was a sufficient change in conditions in Albania to rebut Petitioner's claim of a well-founded fear of persecution.

### D. THE "CLEAR PROBABILITY OF PERSECUTION" STANDARD IS A STRICTER STANDARD THAN THE WELL-FOUNDED FEAR STANDARD

Even if Petitioner has established a well-founded fear, once an alien is scheduled for deportation, in order to qualify for withholding of deportation, the alien must establish that there is a "clear probability" that he will be subject to persecution if forced to return to the country of removal. *Pilica,* 388 F.3d at 951; *Ali*, 366 F.3d at 411 (citing *INS v. Stevic*, 467 U.S. 407, 430 (1984)). This is a stricter standard than the well-founded fear standard for asylum applications. *Ali*, 366 F.3d at 411. However, if there is substantial evidence that supports the Immigration Judge's determination that Petitioner is not eligible for asylum, then Petitioner cannot satisfy the more stringent standard for withholding of deportation. *Mikhailevitch*, 146 F.3d at 391.

As indicated, there is substantial evidence supporting the Immigration Judge's determination that Petitioner is not eligible for asylum. Since Petitioner has not established entitlement to asylum, he has not made the stronger showing necessary for withholding of removal. Nor has he demonstrated his eligibility for relief under the Torture Convention. In order to obtain such relief, an alien has the burden of proving "that it is more likely than not that he or she would be tortured if removed to the proposed

19

country of removal." *Pilica,* 388 F.3d at 951.  Petitioner has not met this burden.

## V.  CONCLUSION

For all of the foregoing reasons, the BIA's order affirming the Immigration Judge's decision regarding Petitioner's claim for political asylum and withholding of removal is AFFIRMED.